IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LISA HILL, individually and as the          )
personal representative of the Estate        )
of Lonnie James Smith, Jr.,                  )
                                             )
          Plaintiff,                         )
                                             )
v.                                           )          CASE NO. 2:20-CV-116- KFP
                                             )
CITY OF MONTGOMERY,                          )
ALABAMA, et al.,                             )
                                             )
          Defendants.                        )

## MEMORANDUM OPINION AND ORDER

Plaintiff Lisa Hill filed this action pursuant to 42 U.S.C. § 1983 on behalf of her

deceased son, Lonnie James Smith, Jr., against the City of Montgomery; Montgomery

Police Department's ("MPD") former Chief of Police, Ernest N. Finley, Jr.; and two MPD

officers, Jarius Booker and Paul Harris.[1] Doc. 1. Plaintiff makes several claims relating to

Smith's arrest, including unlawful seizure, use of excessive force, supervisor and municipal

liability, and wrongful death.[2] Doc. 1.

This case is now pending on Defendants' Motion for Summary Judgment. *See* Docs.

246–47, 260. Upon consideration of the motion, supporting evidence, Plaintiff's response,

---

[1] Chief Finley and Officers Booker and Harris were sued in their individual and official capacities. Doc. 1.
[2] In response to summary judgment, Plaintiff submitted evidence in a variety of forms. Plaintiff's evidence is located in the record in duplicate, in some instances, and in other places it is incomplete. Plaintiff's evidence also includes exhibits containing several parts. On multiple occasions the Court required Plaintiff to supplement the record to ensure the evidentiary submission was complete and accessible. For ease of reference in this Order, the Court refers to Plaintiff's exhibits using its own exhibit numbers set out in the attached chart.

and the hearing on the motion, and for the reasons more fully set forth below, the Court GRANTS Defendants' motion.

## I.       JURISDICTION AND VENUE

The Court has original subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction of Plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a). Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## II.      SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law." A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party seeking summary judgment must inform the court of the basis for its motion and alert the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do

more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). In making its determination, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see* Fed. R. Civ. P. 56(a).

To establish a genuine dispute of material fact, the nonmoving party must produce evidence so that a reasonable trier of fact could return a verdict in his favor. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (citing *Patterson & Wilder Const. Co. v . United States*, 226 F.3d 1269, 1273 (11th Cir. 2000)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.   PROCEDURAL HISTORY

On February 19, 2020, appearing pro se, Plaintiff filed this lawsuit individually and as the personal representative of her son's estate. Doc. 1. Defendants filed an Answer denying liability (Doc. 11) and later filed a Motion for Summary Judgment. Docs. 246–47. Plaintiff filed a response (Docs. 260–61), and Defendants filed a reply, Doc. 266.

After summary judgment was fully briefed, the Court issued an Order requiring the parties to address Plaintiff's capacity, as a pro se litigant, to pursue her claims under 42 U.S.C. § 1983 and Alabama's wrongful death statute. Doc. 273; *see also* Docs. 279–80.

The Court construed Plaintiff's response as a motion for appointment of counsel, denied the motion, and allowed her fourteen days to retain counsel. Doc. 282.

Within fourteen days, Plaintiff secured an attorney. Doc. 284. Both parties consented to jurisdiction by a United States Magistrate Judge. Docs. 287–89. The Court then held a hearing at which all parties were represented by counsel who presented argument on the motion for summary judgment. Doc. 291.

## IV.    FACTUAL BACKGROUND

This case involves a series of events resulting in the tragic death of a young man—Plaintiff's son, Lonnie James Smith, Jr. Doc. 1 at 2. The relevant events took place over a very short amount of time.

Around 1:50 p.m. on February 21, 2018, MPD learned an individual had been shot on Westcott Street in Montgomery, Alabama. Docs. 247-1 at 3, 247-3 at 4. At about 1:51 p.m., Montgomery Fire Department Sergeant Corey McQueen, responding to the report, drove a fire truck towards Westcott Street. Sergeant McQueen stopped on the corner of Stephens and Hill Streets to await instruction from the MPD. Docs. 247-1 at 8, 247-3 at 4; *see also* Doc. 247-4. As the fire truck stopped, Sergeant McQueen observed near the fire truck "a black male with no shirt wearing blue jeans and holding a handgun . . . headed toward Hill Street." Doc. 247-3 at 4. To avoid a conflict, Sergeant McQueen drove the truck away from the area and alerted the MPD to what he had observed. *Id.*; Doc. 247-1 at 3, 8.

Surveillance cameras from the Freewill Baptist Church captured the events that transpired next and show the following:

- A black male wearing blue jeans and no shirt can be seen walking down Stephens Street toward Hill Street.

- Moments later, Officer Harris and his trainee, Officer Christopher Brown, are seen arriving in their patrol vehicle at the corner of Stephens and Hill Streets.

*See* Ex. 1; *see* Doc. 247-4 at 2.

Officers Harris and Brown were in the area following reports of the initial shooting on Westcott Street. Exs. 2–3. While en route, the officers overheard the report that the suspected shooter was walking west on Stephens Street and holding a handgun. *Id.* The officers received a description of the suspect: a black male wearing blue jeans and no shirt. Exs. 4, 18. About three minutes after receiving the initial report, the officers approached the intersection of Stephens and Hill Streets, where they observed a black male wearing blue jeans and no shirt and carrying a handgun.[3] Upon making this observation, Officer Harris stopped the patrol vehicle. Exs. 2–5.

As Officer Harris exited the vehicle, Smith pointed his firearm at Officer Harris, fired twice, and then ran away. Doc. 247-3; Exs. 1–4, 5 at 13:54:51. Officer Harris sustained a minor gunshot wound to the foot. Exs. 2, 6 at 57–58. As Smith fled, Officer Harris reported the critical details of the incident to his police radio: what happened— "shots fired"; who did it— "black male, blue jeans"; the nature of the resulting injury to

---

[3] This individual was later identified as Smith. *See* Doc. 1 at 6.

Officer Harris—"been hit in the foot"; and where the suspect could be found—running "north on Hill Street" behind the "Freewill Missionary Baptist Church." Exs. 7–8.

Officer Booker and his trainee, Officer Demetrius Huitt, had also responded to the shooting on Westcott Street. Exs. 8–9. At the scene, the officers observed the victim and spoke to several witnesses who described the shooter as a black male wearing jeans and no shirt. Ex. 10. The witnesses told the officers the suspect proceeded on foot westward. Exs. 9–10. Officers Booker and Huitt began a vehicle pursuit in search of the suspect. Exs. 8–10. While doing so, the officers received Officer Harris's report that a black male wearing blue jeans shot him and was running north on Hill Street. *See* Ex. 8 at 13:55:00. In response, Officer Booker immediately drove that direction to look for the suspect. *Id.* Less than one minute after receiving Officer Harris's "shots fired" report, Officer Booker identified a person matching the suspect's description near the Freewill Baptist Church. *See id.* at 13:55:28; *see also* Ex. 11 at 01:37. This individual was later identified as Smith. *See* Doc. 1 at 7–8.

As Officer Booker pulled up in his police vehicle by Freewill Baptist Church, Smith continued running. Exs. 8–11. Officer Booker stopped his vehicle, exited, and pursued Smith on foot; Officer Huitt followed running behind Officer Booker. Exs. 8, 14, 12–13; *see also* Doc. 247-4 at 2. Officer Booker commanded Smith to stop several times to no avail. Exs. 9–10, 14. Within a few seconds, both men were on Jordan Street behind the Freewill Baptist Church, and Officer Booker retrieved his service weapon and fired at Smith several times, injuring Smith and causing him to fall to the ground. Exs. 9, 5 at 13:55:53, 12–14.

Officer Booker ran to Smith and handcuffed him. Moments later, several MPD and SWAT officers arrived. Ex. 12. A weapon was found near Smith. Ex. 20 at 3; *see also* Exs. 12, 17. Medical care was dispatched.[4] Exs. 12; 15 at 38–41. In accordance with the MPD's policies, Officer Booker was removed from the immediate area while other officers oversaw the scene. Exs. 9, 12. A few moments later, Officer Harris arrived at the scene, but he was also removed to assess his foot injury and call his family. Exs. 7, 12.

Body camera footage shows officers monitoring Smith's pulse and trying to keep him conscious. Exs. 12, 16 at 40, 17. Officers can be heard telling Smith to "wake up" and that "medics are on the way, buddy." Ex. 17. Around seven minutes elapsed between the time Smith was shot and the time the ambulance arrived. *See* Ex. 17, 02:15–09:40. Unfortunately, Smith died from his injuries. Doc. 1 at 1.

## V.    DISCUSSION

Plaintiff claims Officers Harris and Booker violated Smith's constitutional rights, the City of Montgomery and Chief Finley maintain deficient policies and training, and Defendants are liable under Alabama's wrongful death act. *See* Doc. 1. Defendants contend Plaintiff has not presented sufficient evidence to establish a genuine issue of material fact to present any claims to a jury. *See* Doc. 247.

Plaintiff, who proceeded through the majority of this litigation pro se, has offered an impressive amount of evidence for the Court's consideration. Plaintiff was required to

---

[4]Although no officer explicitly called for medical assistance, in depositions, multiple officers testified that medical assistance is automatically dispatched when officers report a shooting. Exs. 16 at 44; 15 at 38–41; 23 at 49:27. For example, Officer Frederick Brewer testified that he reported the shooting to his police radio and advised dispatch of their location, which prompted dispatch to send medical care. Ex. 15 at 38–41.

point to evidence in the record, such as depositions, documents, or stipulations, showing a genuine issue of material fact exists. Disputes of fact are inconsequential on summary judgment if they are immaterial or based solely on speculation and not record evidence. *See, e.g.*, *Brown v. Bellinger*, 843 F. App'x 183, 186–87 (11th Cir. 2021) (affirming summary judgment in part because factual disputes as to whether suspect was involved in crime was unsupported by the record and in part because factual disputes as to whether officer was responding to a call was immaterial); *Baxter v. Roberts*, No. 21-11428, 2022 WL 17332720, at *19 (11th Cir. 2022) (affirming summary judgment because plaintiff's evidence was immaterial and would not lead a reasonable jury to find that sheriff violated plaintiff's constitutional rights). For the reasons below, summary judgment must be granted.

### A.   Chief Finley and Officers Harris and Booker are immune in their official capacities.

"A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman*, [465 U.S. 89, 100] (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe* [*of Fla.*] *v. Florida*, [517 U.S. 44, 59] (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1429 (11th Cir. 1997), *overruled in part on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir.

2009). Police chiefs and police officers are state officials. *See Smith v. City of Montgomery*, No. 2:10-CV-1007-WKW; 2:10-CV-1008-WKW, 2011 WL 5216309, at *5 (M.D. Ala. Nov. 2, 2011) (police chief and officers immune in official capacities because they are state officials) (citing *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994)). Accordingly, a plaintiff's claims for monetary damages against police chiefs and officers in their official capacities fail as a matter of law. *See id.; McElroy v. City of Birmingham, Ala.*, 903 F. Supp. 2d 1228, 1242 (N.D. Ala. 2012) (granting defendant's motion for summary judgment as to all claims involving police officer in his official capacity); *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (an official-capacity action for damages cannot be maintained against government official); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (affirming district court's decision to grant directed verdict in favor of defendants because to allow claims against officers in both their official and individual capacities would be "redundant and possibly confusing to the jury").

Plaintiff seeks to recover monetary damages from Chief Finley and Officers Harris and Booker and sues them in their official capacities as law enforcement officers for the City of Montgomery. Doc. 1 at 2, 17, 19–20, 23, 25. These individuals were indisputably state actors on February 21, 2018; therefore, they are entitled to immunity from claims seeking monetary damages. *See Lancaster*, 116 F.3d at 1429.[5]

---

[5] Plaintiff does not dispute this.

**B.    Officers Harris and Booker are entitled to qualified immunity in their individual capacities.**

Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and it 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Ashcroft v. al-Kidd* 536 U.S. 731, 743 (2011)).

To receive qualified immunity, the public official must first prove he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no question that Officers Harris and Booker were within the course and scope of their discretionary authority when the alleged conduct occurred. According to MPD's Arrest Procedures, officer duties include investigatory stops, arrests, and the use of force where necessary. Ex. at 1, 5. Both officers attempted to stop Smith, and Officer Booker used deadly force against him. Therefore, Plaintiff must allege facts that, when read in a light most favorable to her, show that Officers Harris and Booker are not entitled to qualified immunity.

To satisfy this burden, Plaintiff must show that Defendants violated a clearly established constitutional right. *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). First, the Court considers whether a plaintiff has alleged a violation of a

constitutional right. Second, the Court examines whether that right was clearly established when the misconduct occurred. "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. . . . In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations and quotation marks omitted) (alteration in original). If a plaintiff cannot establish both elements, the defendant is entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (*Pearson v. Callahan*, 555 U.S. 223, 241–42 (2009)).

Plaintiff's Complaint alleges in Counts I and II that Officers Harris and Booker violated Smith's constitutional rights because they (1) unlawfully seized Smith[6] and (2) used excessive force against him. Doc. 1 at 15, 18–19.[7]

### 1.    Officer Harris did not violate Smith's constitutional rights.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. Amend. IV; *Terry v. Ohio*, 392 U.S. 1, 20 (1968). "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement . . . through means intentionally applied[.]" *Brendlin v. California*,

---

[6] Specifically, Plaintiff claims Officers Harris and Booker lacked the legal basis to stop, confront, pursue, and seize Smith. Docs. 1 at 16; 261 at 16–17. But Plaintiff also states that "[b]y confronting and attempting to stop [Smith][,]" Officers Harris and Booker "initiated . . . investigative stop[s] and seiz[ures] within the meaning of the Fourth Amendment[.]" Doc. 1 at 15.

[7] Because Officer Booker's seizure of Smith involved a use of force that Plaintiff challenges as excessive, Officer Booker's seizure of Smith is analyzed as part of the excessive force claim.

551 U.S. 249, 254 (2007) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989)); *California v. Hodari D.*, 499 U.S. 621, 624 (1991); *Real v. Perry*, 810 F. App'x 776, 779 (11th Cir. 2020) ("A seizure occurs if, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'") (citations omitted).

A seizure occurs when an officer performs an investigatory stop, *Terry*, 392 U.S. at 16–27, displays his weapon, *United States. v. Mendenhall*, 446 U.S. 544, 554 (1980) (citations omitted), or uses deadly force, *Tennessee v. Garner*, 471 U.S. 1, 2 (1985). But an *attempted* seizure is not a seizure. *See Hodari D.*, 499 U.S. at 626. For example, the act of an officer chasing a fleeing suspect and commanding him to stop is not a seizure where the suspect refuses to yield. *Id.*; *Reed v. Clough*, 694 F. App'x 716, 724 (11th Cir. 2017) (citing *Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1166 (11th Cir. 2005)).

A law enforcement officer may only seize a suspect if he has reasonable suspicion the suspect might be connected with criminal activity. *Terry*, 392 U.S. at 11; *see also Brown v. Texas*, 443 U.S. 47, 51 (1979) (citations omitted). An officer has reasonable suspicion if he is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21 (citations omitted). Courts must employ an objective standard: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?'" *Id.* at 22 (citing *Carroll v. United States*, 267 U.S. 132, 162 (1925); *Beck v. State of Ohio*, 379 U.S. 89, 96–97 (1964)). In other words, a court evaluates reasonable suspicion "from the totality of the

circumstances, and from the collective knowledge of the officers involved in the stop." *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989) (citation omitted). An officer has sufficient reasonable suspicion to stop and seize an individual where the individual matches a suspect's description provided to the officer. *United States. v. Rodger*, 521 F. App'x 824, 829 (11th Cir. 2013) (citation omitted).

### a.   Officer Harris had reasonable suspicion to seize Smith.

The Court will first evaluate whether Officer Harris seized Smith. Critical to this analysis is the sequence of events. Indisputable video evidence shows the following: Smith pointed his weapon at Officer Harris, Smith fired his weapon twice as Officer Harris began stepping out of his vehicle, Officer Harris pointed his weapon in response, Smith fled, and Officer Harris reported the occurrence to his police radio. Exs. 2–5, 7. The entire interaction lasted mere seconds.

The evidence shows Officer Harris did not seize Smith by performing an investigatory stop. In fact, Smith shot at Officer Harris before he completely stepped out of his patrol vehicle. Exs. 2 at 16:05:40, 7. In the light most favorable to Plaintiff, the evidence does show Officer Harris pointed his gun towards Smith, albeit for less than a single second.[8] *See* Ex. 7 at 00:00:00. And, while the act of an officer pointing a gun at an individual is generally considered a seizure, *Mendenhall*, 446 U.S. at 554, the Court finds it difficult to conclude Officer Harris seized Smith under these circumstances. The

---

[8] Officer Harris testified that he was not pointing his weapon at Smith but, rather, was attempting to get in a "low-and-ready position" in response to Smith's firing. Ex. 2 at 17:36. The video evidence is inconclusive on this fine point. Exs. 1, 5, 7. Drawing all inferences in favor of Plaintiff, as is required on summary judgment, the Court concludes Officer Harris pointed his weapon at Smith.

evidence shows Smith had already fired at the officers before Officer Harris pointed his weapon towards Smith. Exs. 2, 5. This situation is more akin to an attempted seizure where a suspect refuses to yield. There, a seizure has not occurred because the suspect has not been restrained in any way. *See Hodari D.*, 499 U.S. at 626; *Reed*, 694 F. App'x at 724. Similarly, here, Smith was not restrained in any way—he fired twice *before* Officer Harris pointed his weapon, and he fled afterwards. Exs. 2, 5. Such brazen action is distinguishable from a suspect whose freedom of movement has been restrained.

Even assuming Officer Harris seized Smith, he had reasonable suspicion to do so. Officer Harris had reasonable suspicion to seize Smith because Smith matched the Westcott shooter's description. *See Rodger*, 521 F. App'x at 829 (citing *United States v. Allison*, 616 F.2d 779, 782 (5th Cir. 1980)); Exs. 2–4, 18. Additionally, before pointing his weapon at Smith, Officer Harris noticed Smith was carrying a handgun. Exs. 2–3, 8. Officer Harris testified he considered Smith to be a threat because he matched the Westcott shooter's description, was armed, and was in close proximity to the initial shooting. Ex. 2 at 40:23. Additionally, because the evidence shows Smith had already fired his weapon before Officer Harris pointed his service weapon at Smith, without consideration of the Westcott shooting, Officer Harris could have reasonably surmised Smith was involved in criminal activity. Based on the information available to Officer Harris at the moment he pointed his service weapon, he had reasonable suspicion to believe Smith was connected with criminal activity. *See Terry*, 392 U.S. at 11; *Brown*, 443 U.S.at 51 (citation omitted).

In an attempt to diffuse Officer Harris's reasonable suspicion, Plaintiff points to Officer Brown's testimony that Smith was walking in a non-threatening manner when the

officers identified him. *See* Ex. 18 at 24:29; Doc. 261 at 16 ("it was confirmed that Mr. Smith was 'walking' down the sidewalk, not fleeing a scene"). While this observation might be accurate, it is irrelevant to whether Officer Harris had reasonable suspicion to seize Smith. There is no requirement an individual be running from a scene for an officer to have reasonable suspicion the person is involved in criminal activity. Given what he knew of the alleged Westcott shooter and the appearance and use of a weapon against him, under the circumstances, Officer Harris had reasonable suspicion to seize Smith, and Smith's pace at the moment they intersected is immaterial to that finding.

Plaintiff also relies on an affidavit from Joanna Steiner, a resident of Stephens Street, who attests she has personal knowledge of this incident. Ex. 19. According to Steiner, Smith "did not display any harmful intentions or actions as he calmly walked down the sidewalk pavement . . . seconds prior to making contact with [Officer Harris][,] . . . [and he] was not acting in a violent, reckless, nor threatening manner as he walked down the sidewalk pavement on Stephens Street[.]"*Id.* at 3–4. Again, Smith's behavior before Officer Harris stopped his vehicle and engaged with Smith is immaterial. The salient issue is what information Officer Harris had when he pointed his weapon at Smith because this is the alleged point of seizure. On that subject, video evidence plainly shows Smith first firing his weapon twice at the officers. *See* Exs. 1, 5, 7.

Plaintiff also argues that Smith did not match the several descriptions provided to police of the Westcott shooter. Doc. 261 at 16. But Plaintiff's evidence shows that Officer Harris was provided the suspect's description as: black male wearing blue jeans and no shirt. *See* Exs. 4, 18. Further, even if there was a discrepancy regarding the Westcott

shooter's description, the undisputed video evidence clearly shows Smith fire his weapon at Officer Harris, and that alone would give Officer Harris reasonable suspicion to seize Smith. *See* Exs. 1, 5, 7.

Finally, Plaintiff contends Smith was a licensed gun owner and was not breaking the law when Officer Harris seized him. Doc. 261 at 16. Smith's licensure status is inconsequential. Licensure is not a permission slip to fire a weapon at others at will, and it does not impugn the police officer's ability to act on reasonable suspicion once he encountered a suspect matching the Westcott shooter's description or when met with gun fire. To the extent Officer Harris seized Smith at all, it was not unconstitutional, as he had reasonable suspicion to do so.

### b.    Officer Harris did not use any force against Smith.

Plaintiff argues Officer Harris fired his weapon and, in doing so, used excessive force. Doc. 1 at 6. However, there is no evidence in the record that Officer Harris fired his weapon or ever used any force at all. The video footage shows that Officer Harris momentarily raised his service weapon while exiting his vehicle; it does not show Officer Harris using his weapon. Ex. 1. *See* Doc. 1 at 5–7, 18–19. Additionally, all of Officer Harris's bullets were accounted for. *See* Docs. 247 at 8, 247-8. In fact, the crime scene investigation only revealed a single shell casing from a .45 caliber gun—the type of gun found next to Smith on Jordan Street. Ex. 20 at 3, 5.

Plaintiff points to Officer Brown's testimony opining that it is possible Officer Harris also fired his service weapon during the brief encounter.[9] Ex. 18 at 34:35. Though this statement presents a "metaphysical doubt" as to Officer Harris's use of his weapon, it is not enough to prevent summary judgment. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586 (citations omitted). A mere "possibility" without any evidentiary support, in light of the video evidence confirming shots only from Smith's weapon, is insufficient to create a question of fact as to Officer Harris's use of force. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (unsupported speculation does not create a genuine issue of material fact) (citation omitted). Similarly, in her response, Plaintiff argues that the Court should surmise Officer Harris fired his weapon based on the sound of "springs," which she argues can be heard in his service weapon in Officer Harris's body camera video. Doc. 261 at 5. However, there is no testimony identifying the sound of "springs" on the video. Further, even if the sound could be identified, there is no evidence that the "springs" sound comes from Officer Harris's weapon. Compounding this speculative argument is that there is no evidence that the "springs" sound demonstrates that Officer Harris's weapon was actually fired. No reasonable jury could conclude that Officer Harris used force based on the purported sound of "springs." This argument, based entirely on speculation, is insufficient to create a genuine issue of material fact to survive summary judgment. *See Cordoba*, 419 F.3d at 1181 (citation omitted).

---

[9] At the motion hearing, Plaintiff's counsel maintained there "might be" some "gray area" as to whether Officer Harris fired his weapon, but he recognized this is not enough to survive summary judgment.

Additionally, Plaintiff relies on Ms. Steiner's affidavit testimony that Smith was calm and not acting in a threatening manner, at some point, while he walked on Stephens Street. *See* Ex. 19. But Smith's behavior does not impact the Court's excessive force analysis at this juncture because Plaintiff has failed to show Officer Harris used any force. *See Redwing Carriers, Inc.*, 94 F.3d at 1496 (citation omitted). Thus, Plaintiff's evidence does not create a genuine issue of material fact.

### 2.    Officer Booker's use of force was constitutional.

The Fourth Amendment prohibits excessive force during an arrest. U.S. Const. Amend. IV. "To assert a Fourth Amendment claim based on the use of excessive force, the plaintiff[] must allege (1) a seizure occurred and (2) the force used to effect the seizure was unreasonable." *Troupe*, 419 F.3d at 1166; *Reed*, 694 F. App'x at 724. Excessive force claims are evaluated on a "reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). The reasonableness standard is objective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (1989) (citations omitted). Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Garner*, 471 U.S. 8–9).

As the Supreme Court's seminal case teaches, the Constitution does not permit the use of deadly force to prevent the escape of a suspect "[w]here the suspect poses no

immediate threat to the officer and no threat to others[.]" *Garner*, 471 U.S. 1, at 11–12 (use of deadly force against unarmed burglary suspect was unreasonable because officer was reasonably sure suspect was unarmed). However, the *Garner* Court also held, "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* The Eleventh Circuit delineated the *Garner* standard as follows:

> The *Garner* standard contains three elements. First, an officer must have probable cause to believe that the suspect poses a threat of serious physical harm to the officer or to others. Probable cause of this sort exists where the suspect actually threatens the officer with a weapon or where there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm. Second, deadly force must be necessary to prevent escape. Third, the officer must give some warning regarding the possible use of deadly force whenever feasible.

*Acoff v. Abston*, 762 F.2d 1543, 1547 (11th Cir. 1985); *compare Pruitt v. City of Montgomery, Ala.*, 771 F.2d 1475 (11th Cir. 1985) (use of deadly force was unconstitutional because there was no evidence officer believed suspect was a threat to others or himself, and there was no evidence indicating suspect committed crime involving infliction or threatened infliction of serious harm) *and Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015) *with Harrell v. Decatur Cnty., Ga.*, 41 F.3d 1494 (11th Cir. 1995) *vacating and adopting dissent in* 22 F.3d 1570 (11th Cir. 1994) (officer had probable cause to use deadly force on suspect acting violently and resisting arrest on both self-defense and fleeing-felon grounds where suspect violently beat one officer, threatened to kill another officer, and searched for weapon) *and Nicarry v. Cannaday*, 260 F. App'x 166 (11th Cir.

2007) (probable cause existed because suspect fled on foot, refused to obey commands, and obtained screwdriver that he could have used as weapon).

As applicable here, there are two grounds upon which an officer might derive probable cause under *Garner*. The first arises from an officer facing a suspect the officer believes is a threat to himself or others. *See Pruitt*, 771 F.2d at 1483–84. In those circumstances, "it is reasonable for [the officer] to believe that a suspect poses 'an immediate risk of serious harm to [him]' when the suspect is armed." *Davis v. Waller*, 44 F.4th 1305, 1314 (11th Cir. 2022) (citations omitted). But the suspect need not "point his gun at officers or advance toward them" for the suspect to be a threat. *Howe v. City of Enter.*, No. 1:15-CV-113-JA-SRW, 2018 WL 8545947, at *25 (M.D. Ala. Sept. 17, 2018) (citing *Crosby*, 394 F.3d at 1334); *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("The law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to stop the suspect."); *Powell v. Snook*, 25 F.4th 912, 922 (11th Cir. 2022) (holding that "when a suspect's gun is 'available for ready use'—even when the suspect has not 'drawn his gun'—an officer is 'not required to wait and hope for the best.'") (citing *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010)); *Montoute v. Carr*, 114 F.3d 181 (11th Cir. 1997) (use of deadly force was reasonable even if suspect did not point gun because there was nothing to prevent suspect from turning around and pointing weapon at officer or others in a split second).

The second ground arises when an officer encounters a suspect who is believed to have committed a crime involving the infliction of serious harm. There, whether the suspect is armed is a factor that "might indicate that the suspect had committed a crime involving

the infliction or threatened infliction of serious physical harm." *See Pruitt*, 771 F.2d at 1484. But whether the suspect was actually armed is not the most important consideration—what matters more is what the officer knew at the time of the use of deadly force. *See DeBose v. City of Jacksonville*, No. 3:09-CV-579-J-34MCR, 2012 WL 13098640, at *10 (M.D. Fla. Feb. 7, 2012) (whether suspect involved in armed robbery who led police on foot chase was actually armed "is not the relevant consideration; the relevant question is what the evidence, viewed in the light most favorable to Plaintiffs, shows that [the officer] knew at the time of the shooting") (citation omitted).

The Eleventh Circuit's decision in *Jean-Baptiste* discusses probable cause under both *Garner* prongs. 627 F.3d at 821. There, an officer shot an armed burglary and robbery suspect after he led police on a foot chase through a residential neighborhood, eventually pointing a weapon at officers. *Id.* at 819. The court determined the officer had probable cause to use deadly force based in part on the officer's belief that the suspect was a threat and "[r]egardless of whether [the suspect] had drawn his gun" because the suspect's weapon "was available and ready for use, and [the officer] was not required to wait 'and hope[] for the best.'" *Id.* at 821 (citation omitted). Separately, the court also found probable cause for the use of force on the basis that the officer knew the suspect had committed at least one armed robbery—a dangerous crime—and fled from police. *Id.* at 822. Finally, the court found it was reasonable for the officer to believe the suspect was still armed. *Id*

While the facts presented here are not on all fours with *Jean-Baptiste*, it is informative and persuasive to the Court's analysis. As Officer Booker arrived at the Freewill Baptist Church, he identified Smith as an individual who matched the at-large

suspect's description. Ex. 9. Officer Booker began chasing Smith on foot and commanding him to stop. Exs. 9, 12. When Officer Booker reached Jordan Street during the foot pursuit, he retrieved his service weapon and fired at Smith. Exs. 9–10, 12. At this point, his actions amounted to a seizure. *See Garner*, 471 U.S. at 7. Thus, the question for the Court is whether the force he used was excessive. In making this determination, the Court considers whether Officer Booker had probable cause to believe Smith posed a risk of serious harm or committed a crime involving infliction of serious harm, whether force was necessary to prevent escape, and whether a warning was feasible.

> **a.    Officer Booker had probable cause to believe Smith posed a threat of serious physical harm.**

Officer Booker had probable cause to use force on the grounds set out in *Garner*. First, Officer Booker had probable cause to believe Smith posed a threat of serious physical harm to himself and others.

While Officer Booker contends Smith turned and pointed a gun at him during the chase, which prompted Officer Booker to fire his service weapon (Exs. 9–10),[10] Plaintiff has submitted two nearly identical affidavits from Ernestine Hardy and Sheila Robinson disputing this allegation (Exs. 21–22). The affiants assert that Smith "did not point a gun at [O]fficer Jarius Booker[.]" *Id.* Defendants contend these affidavits are clearly contradicted by video evidence. Doc. 266 at 3. However, video evidence does not show Smith turning and pointing a weapon—Smith is out of view in the moments immediately

---

[10] Officers Booker and Huitt claim Smith turned around and pointed his handgun at Officer Booker, warning him to "get back." Exs. 9 at 12:51, 10 at 3:15:25, 14 at 3:34:35, 25 at 14:30.

preceding and during Officer Booker's use of force. *See* Exs. 12–13. Drawing all inferences in favor of Plaintiff, as is required on summary judgment, the Court will accept that Smith did not turn and point his weapon at Officer Booker.[11]

Yet, under this version of events, Officer Booker had probable cause to believe Smith posed an immediate risk of serious harm to himself and others.[12] Officer Booker had reason to believe Smith was armed because he knew Smith matched the description of the suspect who shot Officer Harris nearby less than one minute before Officer Booker encountered Smith. From this alone, Officer Booker could have reasonably believed Smith was still armed and posed an immediate risk of serious harm. *See Waller*, 44 F.4th at 1314; *Jean-Baptiste*, 627 F.3d at 822. Additionally, Officer Booker knew Smith matched the

---

[11] The Court recognizes that the Hardy and Robinson affidavits are contradicting on other points. The affidavits contain these internally conflicting statements:

> 5. Officer **Jarius Booker did not fire his service weapon**, nor any bullets **on Jordan Street** in Montgomery, Alabama. . . .

> 7. Lonnie James Smith, Jr. **was not shot in the back**, posterior area of the body, **on Jordan Street** in Montgomery, Alabama.

> 8. The victim, Lonnie James **Smith, Jr**. . . . **was shot in the back**, posterior area of the body, **by Jarius Booker on Jordan Street** in Montgomery, Alabama.

Exs. 21 at 2, 22 at 2 (emphasis added). Additionally, the affidavits state that Smith was "wounded and shot in the back . . . prior to arriving on Jordan Street in Montgomery, Alabama." *Id*. (emphasis added). But neither affiant testifies that she had a view of the interactions between Smith and officers anywhere other than on Jordan Street. Critically, video evidence confirms that Booker fired his weapon in Smith's direction while on Jordan Street, not before, and Smith fell to the ground on Jordan Street. Exs. 12 at 24:34–25:05, 13 at 01:52–2:11. *See Morton v. Kirtwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (holding "where an accurate video recording completely contradicts a party's testimony, that testimony becomes incredible"); *Scott*, 550 U.S. at 380–81 (because plaintiff's "version of events [w]as so utterly discredited by the record . . . [t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape").

The affidavits also state Smith did not throw a weapon, "nor was a weapon thrown out of [Smith's] hand on Jordan Street." *Id*. The video evidence confirms a weapon was found near Smith at the scene. Exs. 12, 17, 20 at 3.

[12] The "others" at issue include Officer Huitt, who was a few feet behind Officer Booker, Ex. 14, and, as Plaintiff acknowledged, people nearby in this residential area, Doc. 1 at 72.

Westcott shooter's description, and that shooting occurred shortly before the encounter with Officer Harris.[13] Like the officer in *Jean-Baptiste*, who encountered a suspect thought to have committed armed robbery, Officer Booker encountered Smith, who was thought to have (1) shot an officer less than one minute prior and (2) shot a citizen not long before that. *See* 627 F.3d at 822. Here, like in *Jean-Baptiste*, it would have been reasonable for Officer Booker to believe Smith was still armed. *Id.* Knowing Smith's weapon was likely available and ready for use, Officer Booker did not have to wait until Smith threatened him with his deadly weapon. *See Howe*, 2018 WL 8545947, at *24 (citation omitted); *Long*, 508 F.3d at 581 (citation omitted); *Powell*, 25 F.4th at 922 (citation omitted); *Montoute*, 114 F.3d at 185. He was not required to wait and hope for the best, at risk of becoming Smith's third victim. *See Jean-Baptiste*, 627 F.3d at 821 (citation omitted). Thus, Officer Booker had probable cause to believe Smith was a threat. *See id.*

Second, under *Garner*, Officer Booker had probable cause to believe Smith committed a crime involving the infliction of serious harm. Officer Booker knew Smith matched descriptions of both the Westcott shooter and Officer Harris's shooter, Smith shot Officer Harris less than one minute before their encounter, Smith ignored several commands to halt, and Smith was evading arrest by fleeing through a residential neighborhood. Exs. 8–10. Officer Booker had knowledge similar to that held by the officer in *Jean-Baptiste*: both officers knew the fleeing individual was suspected of committing

---

[13] For these same reasons, Officer Booker had reasonable suspicion to seize Smith. *Terry*, 392 U.S. at 10; *Rodger*, 521 F. App'x at 829 (citation omitted).

crimes involving the infliction of serious harm. *See* 627 F.3d at 822. Here, however, the proximity between the last-believed dangerous crime and flight was even closer than in *Jean-Baptiste*. *See id.* at 818–19. That close proximity strengthened Officer Booker's probable cause to believe Smith shot Officer Harris. Accordingly, Officer Booker had probable cause to believe Smith had committed a crime involving the infliction of serious harm, and his actions were constitutional. *See Harrell*, 41 F.3d 1494.[14]

### b.      Deadly force was necessary to prevent escape.

The evidence shows that by the time Officer Booker used deadly force, he had reason to believe Smith recently fled the scenes of two shootings and was the suspect in both. *See* Exs. 8–10. Video evidence shows Smith running from the site of Officer Harris's shooting, around the Freewill Baptist Church, and onto Jordan Street. Exs. 1, 11, 13 at 01:54. Officer Booker's police vehicle dash camera footage shows that Smith looked in the direction of Officer Booker's police vehicle, yet he continued to flee. Ex. 8. Officers Booker and Huitt both testified Officer Booker provided Smith several commands to stop

---

[14] In her Complaint, Plaintiff pleads, "When Defendants Harris and Booker seized Mr. Smith, probable cause did not exist naming Mr. Smith as a suspect to any crime committed[.]" Doc. 1 at 16. To the extent Plaintiff seeks to separately challenge Smith's arrest with this allegation, she cannot move forward on this summary judgment record. An arrest occurs when an officer restrains a suspect with the intent of arresting him. *See Hodari D.*, 499 U.S. at 624–25. As described, Officer Harris did not use force to restrain Smith and, thus, did not arrest him. *See id.* When Officer Booker used force and arrested Smith, he had probable cause to do so. Probable cause exists when "the facts and circumstances within the collective knowledge of the law enforcement official, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." *United States v. Pantoja-Soto*, 739 F.2d 1520, 1523 (11th Cir. 1984). Officer Booker knew a man matching Smith's description recently shot a civilian and a police officer. *See* Exs. 8–10, 12. A person of reasonable caution would believe the person matching that description in the area in question and running from police has committed an offense to warrant arrest. *See United States v. Kapperman*, 764 F.2d 786, 790–91 (11th Cir. 1985) (officer had probable cause for arrest in part because the suspect matched the provided description and was evading police).

fleeing, but he continued to run. Exs. 9–10, 14. The Court declines to second-guess Officer Booker's determination that deadly force was necessary, under the totality of these circumstances, to prevent Smith's escape. *See McCullough v. Antolini*, 559 F.3d 1201, 1208 (11th Cir. 2009) ("in light of the deference we afford the split-second police judgments in the field . . . [the officers] had powerful reason to believe that the use of deadly force was necessary to prevent escape"). No reasonable jury could conclude deadly force was not necessary to prevent Smith's escape on these facts. Plaintiff presents no evidence sufficient to create a genuine issue of disputed fact on this issue. *See Redwing Carriers*, 94 F.3d at 1496 (citation omitted).

### c.    A warning was not feasible.

Where feasible, an officer should provide a warning before using deadly force. *Garner*, 471 U.S. at 11–12. But officers are not always required to do so. *Carr v. Tatangelo*, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003) (declining "to fashion an inflexible rule that . . . an officer must always warn his suspect before firing—particularly where . . . such a warning might easily have cost the officer his life") (internal quotation omitted); *Powell*, 25 F.4th at 924 (not feasible for officer to provide warning in the one second between the suspect raising his gun and the officer firing).

There is no evidence Officer Booker provided Smith a warning before using deadly force. However, the circumstances inform the Court that a warning would not have been feasible. Given the proximity to the shooting of Officer Harris less than one minute before, Officer Booker had reason to believe Smith was still armed, and he also had probable cause to believe Smith was a threat. The Court cannot conclude that Officer Booker, reasonably

believing Smith shot another officer almost immediately before their encounter, had to risk his life by issuing a warning before employing lethal force. *See Howe*, 2018 WL 8545947, at *26 (citation omitted). Instead, the Court will afford Officer Booker the deference earned when forced to make a split-second decision in the field on these facts. *See McCullough*, 559 F.3d at 1208. Officer Booker was faced with an unpredictable, fleeing shooter who was evading arrest, and no reasonable jury could find that Officer Booker's use of force was excessive. *See Redwing Carriers*, 94 F.3d at 1496 (citation omitted).

For Counts I and II to survive summary judgment, Plaintiff had to establish a genuine issue of material fact precluding qualified immunity. She has not done so. Defendants are entitled to qualified immunity and, thus, summary judgment on these counts.

### C.   Plaintiff has not shown Smith's constitutional rights were violated by Chief Finley or the City of Montgomery.

Counts III and IV assert claims against Chief Finley and the City of Montgomery. Plaintiff alleges the City of Montgomery is subject to *Monell* liability through its policymaker, Chief Finley. Doc. 1 at 20–24. Plaintiff vaguely alleges in Count III that these defendants were deliberately indifferent, provided insufficient training, and maintained policies in conflict with (unidentified) national standards. *See* Doc. 1 at 20–21. Count IV is titled "§ 1983 – Supervisory and Municipal Liability – Fourth Amendment Use of Excessive Force leading to Death Defendants Finley and City of Montgomery." Doc. 1 at 21. The allegations contained within Count IV are also vague conclusions that these defendants established or consented to policies and procedures that violate the constitution

pertaining to "field interviews, investigatory stops, searches, frisks or pat-downs, or other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force)[.]" Doc. 1 at 22.[15]

A municipality cannot be held liable for § 1983 violations "*solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) (emphasis in original). However, a municipality may be liable under § 1983 "when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible for under § 1983." *Id. Monell* liability attaches when a plaintiff shows "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused that violation." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1333 (11th Cir. 2021) (citing *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). To successfully plead municipal liability based on improper training, a plaintiff must also

---

[15] Supervisory officials, such as police chiefs, are not liable under § 1983 absent exceptional circumstances. *See Braddy v. Fla. Dep't of Lab. & Emp. Sec.*, 133 F.3d 797, 801 (11th Cir. 1998). Supervisor liability attaches in two instances: when "the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Id.* (citing *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990); *McLaughlin v. City of LaGrange*, 662 F.2d 1385, 1388 (11th Cir. 1981); *Young v. Fleming*, 146 F. App'x 393, 395 (11th Cir. 2005) (citation omitted). In either case, liability cannot attach without unconstitutional conduct. *See Myers v. Bowman*, 713 F.3d 1319, 1328–29 (11th Cir. 2013) (section 1983 claim against sheriff fails without an "underlying violation of a constitutional right") (citation omitted). Here, there is no constitutional violation at issue based on the Court's findings that Smith's Fourth Amendment rights were not violated. Accordingly, Chief Finley, as police chief and supervisor, cannot be individually liable under § 1983.

present "some evidence of a pattern of improper training" and proof that the municipality is aware of these deficiencies. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1145 (11th Cir. 2007) (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1161 (11th Cir. 2005)). The standard for holding municipalities liable for § 1983 violations is stringent in order to prevent defacto respondeat superior liability. *Id.* at 392; *see also City of Canton, Ohio*, 489 U.S. at 389–90 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program . . . neither will [arguing] that an injury or accident could have been avoided if an officer had had better or more training[.]") (citations omitted).

Plaintiff alleges that Chief Finley has final authority, makes policy, established and implemented policies and procedures, consented to existing policies and procedures, and establishes and implements policies and procedures for police officers employed by the City of Montgomery. Doc. 1 at 21–22. In essence, Plaintiff seeks to hold Chief Finley liable on respondeat superior principles for what she contends are the "policies and procedures[, which] were the moving force behind" the alleged excessive force causing Smith's death. Doc. 1 at 22.

At the motion hearing, Plaintiff's counsel acknowledged there is no custom, policy, or pattern of improper training presented by the evidence before the Court to preclude

summary judgment on her *Monell* claim.[16] Moreover, the *Monell* claims depend on the presence of an underlying constitutional violation. *See Redd v. Conway*, 160 F. App'x 858, 861 (11th Cir. 2005) (no *Monell* liability without constitutional violation); *Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009) ("[N]either *Monell* . . . nor any of our cases authorize[] the award of damages against a municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm.") (citations omitted); *Rooney v. Watson*, 101 F.3d 1378 (11th Cir. 1996) (unnecessary for court to consider municipal's policy upon determining plaintiff suffered no constitutional deprivation). The Court has already concluded Smith's constitutional rights were not violated. Accordingly, Plaintiff cannot meet the first element required for *Monell* liability to attach. *See Underwood*, 11 F.4th at 1333; *City of Canton, Ohio*, 489 U.S. at 388; *see*

---

[16] Plaintiff's Complaint did not assert a § 1983 deliberate indifference claim for failure to render medical care or provide adequate medical care training; she makes that argument for the first time in response to summary judgment—arguing that the individual defendants and/or the City failed to render necessary medical aid to Smith or failed to properly train regarding medical care. Under a section of the Complaint titled "Material Facts," she alleged Officer Booker did not render medical care and allowed Smith to "bleed out" (Doc. 1 at 8), but as the City notes in its reply in support of summary judgment, Plaintiff did not plead a deliberate indifference claim based on medical care. Thus, the belatedly-raised issue is not properly before the Court. *See Gilmore v. Gates, McDonald & Co.*, 382 F.3d 1312, 1313–15 (11th Cir. 2004).

At the motion hearing, Plaintiff's counsel expressed frustration with the level of care rendered by officers at the scene before the arrival of the medics seven minutes after the shooting. *See* Ex. 17, 02:15–09:40. But, as an officer of the Court, Plaintiff's counsel also candidly acknowledged that there is insufficient evidence in the record as to the sufficiency of medical care provided or related training. Indeed, the record demonstrates that Officer Booker knew medics would be summoned given his report of an officer-involved shooting, which he called into his police radio immediately after firing his weapon at Smith. Ex. 17 at 2:15. The evidence shows medical assistance is automatically dispatched when officers report a shooting (Ex. 15 at 38–41). The evidence also shows that Officer Booker was removed from the immediate area following the shooting and placed in a nearby patrol vehicle. Ex. 12. He was not in a position to render hands-on medical care. After the shooting, Officer Harris was also removed from the scene to tend to his injury and call his family. Ex. 7. There is simply no evidence showing Officers Booker or Harris disregarded the risk of serious bodily harm or acted with gross negligence. *See Wade v. Daniels*, 36 F.4th 1318, 1326 (11th Cir. 2022) (citing *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015)).

*also Davidson v. City of Opelika, Alabama*, No. 3:14-CV00323, 2016 WL 8315786, at *6 (M.D. Ala. Feb. 4, 2016) (citation omitted). Defendants are entitled to summary judgment on Counts III and IV.

### D.      Defendants are entitled to State-agent immunity.[17]

Under Alabama's wrongful death statute, a personal representative may file suit against one whose wrongful act, omission, or negligence caused the death of another. Ala. Code § 6-5-410 (1975). But liability for wrongful death is limited as applied to peace officers. *See* Ala. Code § 6-5-338(a). Section 6-5-338(a) provides, in pertinent part, "[e]very peace officer . . . shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." *See Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000). In *Cranman*, the Alabama Supreme Court stated:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons . . . .
>
> Notwithstanding anything to the contrary in the foregoing statement . . . a State agent *shall not* be immune from civil liability in his or her personal capacity (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

---

[17] As discussed *supra*, Officers Harris and Booker may only be liable in their individual capacities.

*Ex parte Cranman*, 792 So. 2d at 405, *holding modified by Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006).[18]

The court employs a burden-shifting analysis to determine whether a state agent enjoys immunity. *Ex parte Est. of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006) (citing *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003)); *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 740–41 (11th Cir. 2010) (citation omitted); *Stryker v. City of Homewood*, No. 2:16-CV-0832-VEH, 2017 WL 3191097, at *16 (N.D. Ala. July 27, 2017). The peace officer initially bears the burden of demonstrating the plaintiff's claims arise from a function that would entitle the peace officer to immunity. *Ex parte City of Homewood*, 231 So. 3d 1082, 1088 (Ala. 2017) (citations omitted). To carry that burden, peace officers "must establish (1) that they were peace officers (2) performing law-enforcement duties at the time of the accident and (3) exercising judgment and discretion. If they can do so, the burden then shifts to [the plaintiff] to show that one of the *Cranman* exceptions applies." *Id.* at 1085.

Officers do not have discretion to use excessive force. *McElroy*, 903 F. Supp. 2d at 1256 ("While the use of force is typically within the discretion of an officer[,] . . . the use of an unreasonable and egregious level of force is not.") (citing *Mann v. Darden*, 630 F. Supp. 2d 1305, 1318 (M.D. Ala. 2009)) (internal citation omitted)). If the plaintiff fails to

---

[18] In *Hollis*, the Alabama Supreme Court amended the language that extended immunity to those "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons," to add "or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975." 950 So. 2d 300, 309 (Ala. 2006).

present a genuine issue of material fact as to whether the force used was excessive, summary judgment is appropriate. *Mann*, 630 F. Supp. 2d at 1318 (citing *Franklin v. City of Huntsville*, 670 So. 2d 848, 852 (Ala. 1995)).

### 1.    Officer Harris enjoys State-agent immunity.

Defendants have made all three necessary showings as to Officer Harris. First, Defendant Harris was a peace officer on February 21, 2018. *See Stryker*, 2017 WL 3191097, at *16–17 (holding city police officers sued in their individual capacities for claims arising out of their arrest of plaintiff were peace officers for purposes of § 6-5-338(a)). Second, he was performing law-enforcement duties at the time of the alleged events. Defendants point to an exhibit detailing Montgomery police officers' duties, which include investigating criminal activity, arresting offenders, and searching for known suspects. Doc. 247-7 at 2. Officer Harris's actions fall squarely within these responsibilities. Finally, Defendants have shown Officer Harris exercised judgment and discretion at the time of the alleged events. The evidence shows Officer Harris went to the corner of Stephens and Hill Streets to search for an at-large suspect. Upon identifying an individual who matched the suspect's description, Officer Harris attempted to perform an investigatory stop. This is a discretionary function. *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1268 (11th Cir. 2010) ("Police investigations and arrests usually are considered 'discretionary function[s] within the line and scope of . . . law enforcement duties' for the purposes of discretionary-function immunity.") (citing *Swan v. City of Hueytown*, 920 So. 2d 1075, 1078–79 (Ala. 2005)); *see also Ex parte Cranman*, 792 So. 2d at 405)

(discretionary functions include "exercis[ing] judgment in the enforcement of the criminal laws," such as "arresting or attempting to arrest persons").

The burden now shifts to Plaintiff to identify evidence that demonstrates an exception to the attaching immunity. *See Ex parte City of Homewood*, 231 So. 3d at 1088. Plaintiff has failed to do so. She has not established any basis upon which Officer Harris wrongfully caused Smith's death. Plaintiff's Complaint alleges that Officer Harris's "actions and omissions, including shooting, chasing, detaining, and using deadly force violated [Smith's] clearly-established Fourth Amendment rights[,]"and he acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law. Doc. 1 at 16. But Plaintiff fails to support these allegations with evidence or explain how an exception applies. Plaintiff's vague, conclusory arguments are not enough to withstand summary judgment. *See Underwood*, 11 F.4th at 1334; *Sharma v. Johnston*, 515 F. App'x 818, 819 (11th Cir. 2013) (citation omitted) (holding that "[u]nsworn statements may . . . not be considered when evaluating a summary judgment motion"). The undisputed facts demonstrate Officer Harris was uninvolved in the use of force that resulted in Smith's death.

### 2.   Officer Booker enjoys State-agent immunity.

Defendants have also proved all three required elements as to Officer Booker. First, Officer Booker was a peace officer on February 21, 2018. *See Stryker*, 2017 WL 3191097, at *16–17. Second, Defendants have established he was investigating a crime, searching for a suspect, and effectuating an arrest—all tasks that fall within a Montgomery police officer's responsibilities. *See* Doc. 247 at 16; Doc. 247-7 at 2, Doc. 247-6 at 11. Third,

Officer Booker exercised judgment and discretion at the time of the alleged events. Upon identifying Smith, Officer Booker gave chase in an effort to apprehend Smith, eventually using deadly force. He was exercising discretionary function in pursuing and searching for a suspect and in pursuing him once identified. *See Grider*, 618 F.3d at 1268 (citation omitted); *see also Ex parte Cranman*, 792 So. 2d at 405); *McElroy*, 903 F. Supp. 2d at 1256 (citing *Mann*, 630 F. Supp. 2d at 1317) (internal citation omitted). While the decision to use *excessive* force is not discretionary, *id.*, the Court has already determined Officer Booker's use of force was not excessive.

Next, the burden shifts to Plaintiff to identify facts proving a *Cranman* exception applies. *See Ex parte City of Homewood*, 231 So. 3d at 1088. She has failed to do so. The Court has already determined Plaintiff failed to establish a factual dispute as to whether Officer Booker violated Smith's constitutional rights. Plaintiff has not presented evidence that Officer Booker acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law. There is simply no evidence to create a genuine issue of material fact precluding State-agent immunity. *See Underwood*, 11 F.4th at 1334.

### 3.   Chief Finley enjoys State-agent immunity.

Plaintiff alleges Chief Finley is liable under § 6-5-410 because he established and authorized unlawful policies and failed to train his employees. Doc. 1 at 11–14, 21–24. Defendants can make all three necessary showings as to Chief Finley. First, Chief Finley, as the chief of police, was a peace officer on February 21, 2018. Doc. 247 at 2; *See Hunter v. City of Leads*, No. 1:15-CV-2266-KOB, 2021 WL 3550922, at *6 (N.D. Ala. Aug. 11,

2021); *Quinn v. City of Tuskegee, Alabama*, No. 3:14-CV-1033-ALB-SMD, 2020 WL 1493007, at *8 (M.D. Ala. Mar. 27, 2020) (stating that the chief of police is a peace officer). Second, on the date in question, Chief Finley served as the Chief of Police. Doc. 247 at 14. Plaintiff does not contest that this position entails law enforcement duties.

Finally, Chief Finley's conduct also constitutes a "discretionary function." *See Woods v. City of Birmingham, Alabama*, No. CV-07-BE-1496-S, 2009 WL 10704127, at *4. (N.D. Ala. July 2, 2009) (police chief's duties qualify for State-agent immunity). His duties to implement policies and train personnel as Chief of Police required the exercising of judgment and discretion. *See Poiroux v. The City of Citronelle*, No. 3-0338-BH-M, 2005 WL 2600440, at *6 (S.D. Ala. Oct. 13, 2005) ("The establishment of policies and procedures . . . is within [the chief's] judgment in the administration of the department.") (citation omitted); *Ex parte Cranman*, 792 So. 2d at 405 (tasks justifying State-agent immunity include "exercising . . . his judgment in the administration of a department" including "supervising personnel" or "exercising judgment in the enforcement of the criminal laws of the State").

The burden now shifts to Plaintiff to show a *Cranman* exception applies. *See Ex parte City of Homewood*, 231 So. 3d at 1088. She has not done so. The Court has already determined Plaintiff failed to create a factual dispute as to whether Smith's constitutional rights were violated, so Plaintiff's unsupported arguments the MPD's policies, procedures, or its lack of training contributed to a violation also fail. Additionally, Plaintiff has not presented any evidence that Chief Finley acted willfully, maliciously, fraudulently, in bad

faith, beyond his authority, or under a mistaken interpretation of the law in his supervisory duties. There is no genuine issue of material fact precluding Chief Finley's immunity.

### 4.   The City of Montgomery enjoys State-agent immunity.

Because the other defendants are entitled to State-agent immunity against Count V's wrongful death claim, the City is also immune. *See Howard v. City of Atmore*, 887 So. 2d 201, 211 (Ala. 2003) ("It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune."). "In cases such as this where the 'municipal employee' is a law enforcement officer, Alabama's statutory, discretionary-function immunity explicitly extends an officer's immunity to the employing municipality." *Brown*, 608 F.3d at 742 (citing Ala. Code § 6-5-338(b)). Because Plaintiff has not presented a genuine issue of material fact preventing immunity, summary judgment as to Count V must be granted.

## VI.   CONCLUSION

For the reasons set forth above, it is ORDERED that Defendants' Motion for Summary Judgment (Doc. 246) is GRANTED, and the case is DISMISSED with prejudice.

A final judgment will be entered.

DONE this 14th day of December, 2022.


/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE

| Plaintiff's Exhibit Reference | Description | Court's Exhibit Reference |
|---|---|---|
| 26 LS | Video ch02_20180221144800 | Ex. 1 |
| 7 LS | Officer Harris's video deposition | Ex. 2 |
| 28 LS | Officer Harris's recorded interview with the State Bureau of Investigations | Ex. 3 |
| 29 LS | Officer Brown's recorded interview with SBI | Ex. 4 |
| 13 LS | Officer Harris's dash camera footage | Ex. 5 |
| 9 LS | Lieutenant Harris Crosthwait's deposition transcript | Ex. 6 |
| 12 LS | Officer Harris's body camera footage | Ex. 7 |
| 15 LS | Officer Booker's dash camera footage | Ex. 8 |
| 5 LS | Officer Booker's video deposition | Ex. 9 |
| 30 LS | Officer Booker's recorded interview with SBI | Ex. 10 |
| 26 LS | Video ch03_20180221144800 | Ex. 11 |
| 14 LS | Officer Booker's body camera footage | Ex. 12 |
| 26 LS | Video ch07_2018022114480 | Ex. 13 |
| 4 LS | Officer Huitt's recorded interview with SBI | Ex. 14 |
| 11 LS | Officer Brewer's deposition transcript | Ex. 15 |
| 10 LS | Officer Todd Oliver's deposition transcript | Ex. 16 |
| 18 LS | Officer Christopher Shaw's body camera footage | Ex. 17 |
| 6 LS | Officer Brown's video deposition | Ex. 18 |
| 3 LS | Steiner's affidavit | Ex. 19 |
| 24 LS | SBI Final Summary | Ex. 20 |
| 1 LS | Hardy's affidavit | Ex. 21 |
| 2 LS | Robinson's affidavit | Ex. 22 |
| 8 LS | Officer Shaw's video deposition | Ex. 23 |
| 27 LS | City Council Meeting on April 6, 2021 | Ex. 24 |
| 4 LS | Officer Huitt's video deposition | Ex. 25 |